ADOLPH PAVENSTEDT, Appellant, *v.* NEW YORK LIFE INSURANCE COMPANY, Respondent.

Bills, notes and checks — foreign bills of exchange — what damages recoverable by payee upon foreign bill of exchange protested for non-payment.

1. The damages recoverable by the payee of a negotiable foreign bill of exchange protested for non-payment against the drawer may be deemed to be made up as follows: (1) The face of the bill; (2) interest thereon; (3) protest fees; (4) re-exchange, *i. e.*, the additional expense of procuring a new bill for the same amount payable in the same place on the day of dishonor; or a percentage in lieu of such re-exchange in jurisdictions where it is prescribed by statute.

2. Where a bill of exchange was drawn in South America by a New York corporation directed to itself in New York, and requiring itself to pay a certain sum in New York in our currency, the measure of damages to the payee upon its refusal to pay is the amount of the draft, with interest and protest fees. This is true although the currency of the country in which the bill was drawn depreciated after the date of the bill and its dishonor, so that the holder was required to pay a larger number of dollars in such depreciated currency for the amount of American money for which the bill was drawn than he was able to realize upon the draft in the country where it was drawn in the first instance.

*Pavenstedt* v. *N. Y. Life Ins. Co.*, 113 App. Div. 866, affirmed.

(Argued May 30, 1911; decided October 3, 1911.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered June 15, 1906, which reversed an interlocutory judgment of Special Term overruling a demurrer to the complaint and sustained such demurrer, with leave to plaintiff to amend the complaint.

The nature of the action, the facts, so far as material, and the question certified are stated in the opinion.

*Robert E. L. Lewis* and *William D. Lewis* for appellant. The question raised by the demurrer is one to be decided in accordance with the Law Merchant or the law of commerce. (*Faulkner* v. *Hart*, 82 N. Y. 413; *Mead*

*v. Beale,* Taney, 339; Norton on Bills & Notes, 22, 24; 1 Randolph on Com. Paper, § 5; 3 Kent's Comm. 79, 80, 94; 2 Greenl. on Ev. 253, 278, §§ 253, 265.) Plaintiff is entitled to recover from defendant the special damages claimed in the complaint. (2 Daniel on Neg. Inst. § 1438; *Birdsall* v. *Russell,* 29 N. Y. 220; *Evertson Bank* v. *Nat. Bank,* 66 N. Y. 14; *Spooner* v. *Holmes,* 102 Mass. 503.) The holder of the foreign negotiable bill of exchange upon its non-payment is entitled to recover as damages in an action against the drawer or indorser, not only the principal sum and interest, but protest fees and whatever damages he may be able to show he has sustained by reason of exchange and re-exchange. (*D'Tostet* v. *Baring,* 11 East, 265; 2 Daniel on Neg. Inst. § 1445; Byles on Bills, 588; Randolph on Com. Paper, § 1714; Tiedeman on Com. Paper, § 407; *Bank of United States* v. *United States,* 2 How. [U. S.] 737; *O. L. & Co.'s Bank* v. *Walbridge,* 19 N. Y. 135; *Pollard* v. *Herries,* 3 Bos. & Pull. 355; *Mellish* v. *Simeon,* 2 H. Black. 378.) The bill, having been drawn by defendant, by its agents, upon itself, the payee was at liberty to treat it either as a bill of exchange or a promissory note. (1 Daniel on Neg. Inst. § 398; *Bank of Genesee* v. *Patchin,* 19 N. Y. 312; *First Nat. Bank* v. *Wallis,* 150 N. Y. 455; *Mechanics' Bank* v. *Bank of Columbia,* 5 Wheat. 356; *Jackson* v. *Claw,* 18 Johns. 348; *Shaw* v. *Stone,* 1 Cush. 256; *Sally* v. *Terrill,* 55 L. R. A. 730; *Clarke* v. *L. A. P. S. & L. Assn.,* 48 N. Y. S. R. 189; 20 N. Y. Supp. 363; Tiedeman on Com. Paper, 211, § 128; *Cunningham* v. *Wardwell,* 12 Me. 466; 4 Am. & Eng. Ency. of Law [2d ed.], 119; *McCann* v. *Randell,* 147 Mass. 91; *Fairchild* v. *Ogdensburgh R. R. Co.,* 15 N. Y. 337; *Bull* v. *Sims,* 23 N. Y. 370.)

*James H. McIntosh* for respondent. Defendant has already discharged its entire obligation on account of the draft. (*Loudon* v. *Taxing District,* 104 U. S. 771; *City*

*of Memphis* v. *Brown,* 20 Wall. 289; *Arnott* v. *Spokane,* 6 Wash. 442; *Mason* v. *Callender,* 2 Minn. 350; *Thayer* v. *Hedges,* 23 Ind. 141; *Guy* v. *Franklin,* 5 Cal. 416; *Ferris* v. *Barlow,* 2 Aiken [Vt.], 106.) Plaintiff is not entitled to recover damages by reason of exchange and re-exchange. (*Williams* v. *Ayres,* L. R. [3 App. Cas.] 133; *Chrysler* v. *Renois,* 43 N. Y. 209; *Hendricks* v. *Franklin,* 4 Johns. 119.)

WILLARD BARTLETT, J.    This action is brought by the assignees of the payee of a foreign bill of exchange to recover damages from the drawer for the failure of the drawee to accept or pay the bill when duly presented for acceptance and payment.

The demurrer attacks the sufficiency of the complaint, the material allegations of which may be summarized as follows:

The defendant is a New York corporation. On May 22, 1902, in the United States of Colombia the defendant by its agent made and delivered to one Gonzalez its negotiable bill of exchange directed to itself in New York, requiring itself to pay in New York to the order of the said Gonzalez three days after sight the sum of $4,181.60. The next day Gonzalez sold and indorsed the bill in Colombia to Bruer, Moller & Co., receiving therefor $234,169.60 in Colombian money, one dollar in American money being then worth fifty-six dollars in the money of Colombia. Bruer, Moller & Co. thereafter indorsed said draft to their agent in New York, G. Amsinck & Co., who duly presented the same to defendant for acceptance and payment, but acceptance and payment were refused, whereupon the draft was duly protested therefor. Subsequently G. Amsinck & Co. returned the draft to Bruer, Moller & Co., who in turn returned the same to Gonzalez and demanded of him $4,181.60, together with $20.96 interest and $2.90 expenses of protest, in American money which said several sums Gonzalez thereupon paid to

Bruer, Moller & Co. At the time when the defendant refused to pay said draft or bill of exchange and at the time of its return to Gonzalez and the payments made by him to Bruer, Moller & Co. one dollar of American money was worth ninety dollars of Colombian money. By reason of the refusal of the defendant to pay the draft presented Gonzalez was compelled to procure and did procure at the city of Bucaramanga $4,204.86 and was compelled to pay and did pay therefor $376,344 of Colombian money whereby Gonzalez has been damaged in addition to the face value of the draft and interest and protest fees in the sum of $1,579.72 in American money, and on April 21, 1904, there was due from defendant to Gonzalez the sum of $5,785.18 in American money with interest thereon. Upon that day Gonzalez assigned his claim to the plaintiff. No part thereof has been paid except $4,859.31, which has been paid to the plaintiff by the defendant since the commencement of this action and which was received by the plaintiff in payment and satisfaction of the face of said draft, interest thereon and protest fees under a written stipulation that the acceptance of the amount paid would in no way affect, limit or prejudice the plaintiff's right to recover from the defendant the balance of $1,579.72 with interest from the 25th day of August, 1902, for which amount the plaintiff demands judgment.

To this complaint the defendant demurred on the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was overruled at Special Term and the defendant appealed to the Appellate Division where the interlocutory judgment entered upon the demurrer was reversed and the demurrer was sustained, with leave to the plaintiff to serve an amended complaint. Nearly a year after the order of reversal the Appellate Division granted the defendant leave to appeal to the Court of Appeals, and pursuant to such leave the case now comes here. The question certified to this court

by the Appellate Division is: "Does the complaint state facts sufficient to constitute a cause of action?"

The question presented by the appeal is a question of the measure of damages. What damages are recoverable in a suit brought in the state of New York by the holder of a dishonored bill of exchange drawn in the United States of Colombia and payable in the state of New York?

The damages recoverable by the payee of a negotiable foreign bill of exchange protested for non-payment against the drawer may be deemed to be made up as follows: (1) The face of the bill; (2) interest thereon; (3) protest fees; (4) re-exchange, *i. e.*, the additional expense of procuring a new bill for the same amount payable in the same place on the day of dishonor; or a percentage in lieu of such re-exchange in jurisdictions where it is prescribed by statute. (2 Sedgwick on Damages [8th ed.], § 700; Wood's Byles on Bills, p. 418; 2 Daniel on Negotiable Instruments [4th ed.], § 1444; 3 Kent's Com. [14th ed.] p. 115; *Bank of United States* v. *United States,* 2 How. [U. S.] 745, 764; *Oliver Lee & Co.'s Bank* v. *Walbridge,* 19 N. Y. 134; 2 Halsbury's Laws of England, pp. 524, 525.)

By some judges and text writers the term re-exchange is employed in a broader sense to signify all these elements taken together; that is, the *whole* amount for which the payee is entitled to draw a new bill by reason of the dishonor of the original instrument. (4 English Ruling Cases, p. 574, note to *In re General South American Co.*)

The appellant is clearly right in contending that the instrument in controversy must be treated as a foreign bill of exchange and not as a simple order for the payment of money. It is expressly alleged in the complaint to have been "a negotiable bill of exchange in writing dated at Curacao, 10th August, 1901," and directed to the defendant in New York. Where a bill of exchange is

drawn by a corporation upon itself the instrument may be treated as an accepted bill or as a promissory note at the election of the holder. (1 Daniel on Negotiable Instruments, § 424; Negotiable Instruments Law, § 214.)

There is no express mention of re-exchange in the complaint nor are any facts alleged from which it can be inferred that a new draft would have cost the payee any more than the old one.

It seems to have been the intent of the pleader to construct a claim for special damages out of the transactions between Gonzalez and Bruer, Moller & Co., with which the defendant had nothing to do; and such a claim might be established if it appeared that the repayment which Gonzalez had to make to that firm upon the return of the dishonored bill was in excess of what the defendant has paid or avowed its willingness to pay to Gonzalez (or the plaintiff as his assignee).

Taking the facts just as they are stated in the complaint and bearing in mind that the payee of the bill (or his representative) is suing here, what amount of money will afford him complete redress? He sold the bill to parties in Colombia. If he is enabled to retain the sum they paid him for it and is provided with a sufficient additional amount of funds to pay them whatever they may lawfully demand of him on account of the dishonor of the bill by the drawee, he will have suffered no loss.

It is to be observed that the doctrine of re-exchange has generally been applied to bills drawn in the *locus fori* upon foreign places and not to bills drawn in foreign places and payable in the jurisdiction where the suit is brought — as in the case here. In reference to bills drawn outside the state of New York on parties here, it was said in *Guiteman* v. *Davis* (45 Barb. 576 n.) that the principle of re-exchange does not apply; and all the holder is entitled to recover is the amount named in the bill without exchange. To the same effect is *Chrysler* v. *Renois* (43 N. Y. 209).

But let us assume that the damages recoverable on behalf of the payee or other holder of a protested bill drawn elsewhere and payable here are to be measured upon the principle of re-exchange and proceed to inquire whether that leaves the plaintiff in any better position.

The subject of re-exchange as an element in measuring damages has been discussed by almost all the leading text writers who consider the Law Merchant and by a comparatively small number of judges in adjudicated cases. The judicial observations on the subject have rarely been necessary to the point decided and are usually *obiter dicta*.

Re-exchange under the Law Merchant is the price which the holder of a dishonored bill would have to pay in the currency of the country where the original bill was drawn for a good bill payable where the original bill was payable for the same amount of money and the expenses of protest.

Formerly the damages recoverable in an action upon bills of exchange drawn or negotiated within this state and upon parties in other states or foreign countries were regulated by statute, but not the damages recoverable upon foreign bills of exchange payable here. Since the enactment of the Negotiable Instruments Law, however, the whole subject has been relegated to the Law Merchant. (Laws of 1897, chap. 612, § 7.) In the case of inland bills, where there is no difference between the currency or rates of exchange at the time and place where it is payable, the measure of damages is the same as that in the case of promissory notes; "but in regard to foreign bills of exchange," says Mr. Sedgwick in his well-known treatise on the Measure of Damages, "the question becomes more complicated by the introduction of the element of re-exchange;" and he states the general rule to be "that the holder of a bill protested for non-payment is entitled to the amount of the bill, re-exchange and charges." (2 Sedgwick on Damages

[8th ed.], § 700.)    As has already been intimated, some
difficulty arises in ascertaining the precise meaning and
application of the authorities relating to re-exchange on
account of the different senses in which that term is used
by different judges and text writers, the expression being
sometimes employed to signify the whole amount of the
damages recoverable upon a protested foreign bill of
exchange and sometimes to signify merely the excess of
such damages above the face of the bill and protest fees.
The definition of re-exchange most frequently quoted is
that given and illustrated by Mr. Justice BYLES as fol-
lows: " Re-exchange is the difference in the value of a bill,
occasioned by its being dishonored in a foreign country in
which it was payable.    The existence and amount of it
depend on the rate of exchange between the two countries.
The theory of the transaction is this: A merchant in Lon-
don indorses a bill for a certain number of Austrian
florins, payable at a future date in Vienna.    The holder is
entitled to receive in Vienna, on the day of the maturity
of the bill, a certain number of Austrian florins.    Sup-
pose the bill to be dishonored.    The holder is now, by
the custom of merchants, entitled to immediate and
specific redress, by his own act, in this way.    He is
entitled, being in Vienna, then and there to raise the
exact number of Austrian florins, by drawing and nego-
tiating a cross-bill, payable at sight, on his indorser in
London, for as much English money as will purchase in
Vienna the exact number of Austrian florins, at the rate of
exchange on the day of dishonor; and to include in the
amount of that bill the interest and necessary expenses of
the transaction.    This cross-bill is called in French the
*retraite.*    The amount for which it is drawn is called in
low Latin *ricambium,* in Italian *ricambio,* and in French
and English re-exchange.    If the indorser pay the cross
or re-exchange bill, he has fulfilled his engagement of
indemnity.    If not, the holder of the original bill may
sue him on it, and will be entitled to recover in that

action the amount of the *retraite* or cross-bill, with the interest and expenses thereon. The amount of the verdict will thus be an exact indemnity for the non-payment of the Austrian florins in Vienna the day of the maturity of the original bill." (Wood's Byles on Bills, 418.) According to Mr. Justice STORY re-exchange means " the amount for which a bill can be purchased in the country where the acceptance is made, drawn upon the drawer or indorser in the country where he resides, which will give the holder of the original bill a sum exactly equal to the amount of that bill at the time when it ought to be paid, or, when he is able to draw the re-exchange bill, together with his necessary expenses, and interest." (Story on Bills, § 400.) " In point of fact, the re-exchange bill is seldom, if ever, drawn in England or in the United States, but the right of the holder to draw it is recognized by the law merchant of all nations, and it is by reference to this supposed re-draft upon the drawer that the re-exchange is computed." (2 Daniel on Negotiable Instruments, § 1445.) Senator Daniel in the same section defines re-exchange as " the amount for which a bill may be purchased in the country where the original bill is payable, drawn upon the drawer in the country where he resides, which will give the holder a sum exactly equal to the amount of the original bill at the time when it ought to be paid, or when he is able to draw the re-exchange bill, together with the expenses and interest; for that is precisely the sum which the holder is entitled to receive, and which will indemnify him for its non-payment." Chancellor KENT, with characteristic clearness, explains how the element of re-exchange enters into the calculation of the damages sustained by the holder of a foreign bill protested for non-payment, as follows: " The general law merchant of Europe authorizes the holder of a protested bill, immediately to redraw from the place where the bill was payable, on the drawer or indorser, in order to reimburse himself for the principal of the bill protested, the contingent expenses attending it, and the

new exchange which he pays. His indemnity requires him to draw for such an amount as will make good the face of the bill, together with interest from the time it ought to have been paid, and the necessary charges of protest, postage, and broker's commission, and the current rate of exchange at the place where the bill was to be demanded or payable, on the place where it was drawn or negotiated. The law does not insist upon an actual redrawing, but it enables the holder to recover what would be the price of another new bill at the place where the bill was dishonored, or the loss on the re-exchange; and this it does by giving him the face of the protested bill, with interest, and the necessary expenses, including the amount or price of the re-exchange." (3 Kent's Com. 115.)

" As conclusive proof that the holder of a foreign bill of exchange which has not been paid when presented is entitled to damages in addition to the principal sum and interest thereon," the learned counsel for the appellant says that it is only necessary to refer to the statutes of the various states of the United States which prescribe an arbitrary sum that the holder of a dishonored bill of exchange is to receive in addition to the principal sum with interest. An examination of the provisions of the New York Revised Statutes on this subject which were repealed by the Negotiable Instruments Law shows that they prescribed damages in lieu of re-exchange only in the case of bills drawn in this state and payable in other jurisdictions but had no reference to a case like this where the bill was drawn in another jurisdiction and payable here. Before the enactment of any New York statute on the subject immemorial usage in this state allowed twenty per cent damages on the protest of a bill drawn in New York on Great Britain. (*Hendricks* v. *Franklin*, 4 Johns. 119.) This was reduced to ten per cent by the Revised Laws (1 Revised Laws, 770, 771), and remained the same under the Revised Statutes.

It will aid us in applying the rule of re-exchange to the circumstances of the present case to paraphrase the illustration above quoted from Byles on Bills by substituting Colombia and New York for London and Vienna and the drawer of the bill for the indorser. It will then read as follows : A merchant in Colombia draws a bill for a certain number of American dollars payable at a future date in New York. The holder is entitled to receive in New York, on the day of the maturity of the bill, a certain number of American dollars. Suppose the bill to be dishonored. The holder is now by the custom of merchants entitled to immediate and specific redress, by his own act, in this way. He is entitled, being in New York, then and there to raise the exact number of American dollars by drawing and negotiating a cross bill, payable at sight, on his drawer in Colombia for as much Colombian money as will purchase in New York the exact number of American dollars, at the rate of exchange on the day of dishonor; and to include in the amount of the bill the interest and necessary expenses of the transaction. In the case at bar under the allegations of the complaint the cross bill would have had to be for $376,344 in Colombian money. If the payee has received from the defendant enough American money to equal that amount in Colombian money he has received all that he needed to make good his obligations to Bruer, Moller & Co. upon the return of the dishonored bill. The equivalent of $376,344 in Colombian money was $4,264.86 in American money at the time when the payee or holder was entitled to draw the new bill. The defendant has paid the plaintiff that amount in American money, being the face of the original bill together with interest and protest fees. Therefore, nothing more is needed to make good the loss consequent upon the non-payment of the original bill at the time when and place where it ought to have been paid. Even if the defendant had not actually paid this amount representing the face of the original bill

with interest and protest fees, that sum would have been the limit of the plaintiff's recovery; because it would have sufficed to pay the new draft which he was entitled to draw under the doctrine of re-exchange.

In the case of a contract made in one country for the payment of money in another the place where the money is payable as well as the currency in which the payment is to be made are material ingredients to be considered. (Story on Conflict of Laws [8th ed.], § 308.)   In *Cash* v. *Kennion* (11 Vesey, 314) it was held by Lord Eldon that if a man in a foreign country agreed to pay one hundred pounds in London upon a specified day he ought to have that sum in London on that day, and if he failed so to do wherever the creditor may sue him the law of the forum ought to give him just as much money as he would have received if the contract had been fully performed. According to the theory of re-exchange, as soon as the bill in the present case was dishonored in New York it was the privilege of the holder to draw a new bill in New York upon the defendant in Colombia for such an amount as would afford perfect indemnity.   (*Oliver Lee & Co.'s Bank* v. *Walbridge,* 19 N. Y. 134.)

According to the complaint the defendant has paid to the plaintiff and the plaintiff has received in payment and satisfaction of the face of the draft, interest thereon and protest fees the sum of $4,859.31.   This must be made up of $4,181.60, the face of the draft, the balance of $677.71 representing interest and protest fees.   While it is stipulated that the receipt of this amount is not to affect the plaintiff's right to recover the balance which he claims on account of re-exchange, the payment, nevertheless, is a recognition by the defendant of its liability to that extent.   It is an acknowledgment that on the day when the bill was protested for non-payment the holder was entitled to receive from the defendant the face of the bill, $4,181.60, with the expenses of protest and interest if any had then accrued.   The contention of the plaintiff on

this appeal is that inasmuch as Gonzalez paid Bruer, Moller & Co. $376,344 in Colombian money when the original bill was returned by that firm to him he is entitled to have recourse against the defendant for indemnity. I have endeavored to show, however, that he would have received full indemnity at that time by the payment to him of the face of the bill in American money, together with the protest fees and interest, for that amount would have enabled him to purchase the precise sum in Colombian currency which he was obliged to pay Bruer, Moller & Co. upon the return of the dishonored paper. The damages recoverable now are to be measured by the rights and obligations of the parties as they existed then; and it follows that the defendant is not liable for any more than it has paid.

My conclusion is that the theory of measuring his damages upon which the plaintiff insists when applied to the facts set out in his complaint does not entitle him to demand any more from the defendant than he has already received. Hence the Appellate Division was right in sustaining the demurrer, although I am not able fully to concur in the reasoning which led the learned judges of that court to this result. The order appealed from should, therefore, be affirmed, with costs, and the question certified answered in the negative.

CULLEN, Ch. J. I concur in the opinion of WILLARD BARTLETT, J., for the affirmance of the judgment. If the old statutes of this state were still in force they would have no relevancy to this controversy. They applied only to bills of exchange drawn or negotiated in this state and payable elsewhere, not to bills drawn elsewhere payable here. This is necessarily the case, for unless the drawee accepted the draft no action would lie against him in favor of the holder, while if he did accept the draft, on failure to pay, he was liable to a holder only for its face, interest and protest fees and not for re-exchange (2 Sedg-

wick on Damages [8th ed.], § 700; *Bowen* v. *Stoddard*, 10 Metc. 375; *Manning* v. *Cohen*, 44 Ala. 343; Byles on Bills [7th ed.], 420; *Napier* v. *Shneider*, 12 East, 420; *Woolsey* v. *Crawford*, 2 Camp. 445), though his liability might be greater to the drawer of the bill. (*Riggs* v. *Lindsay*, 7 Cranch, 500; *In re General South American Company*, L. R. [7 Ch. Div.] 637.) Being practically a bill of exchange drawn on itself, the defendant might be sued either as a drawer or acceptor, though in form the bill had not been accepted. But as acceptor its liability was, under the authorities cited, limited to the face of the bill, which it has since paid. Therefore, if the plaintiff is entitled to recover any greater sum it must be by treating the action as brought against the defendant as drawer. We may assume for the argument that in that view of the case the plaintiff is entitled to recover any damage of whatever character he suffered by the defendant's failure to pay the bill. The plaintiff believes that he has been damaged by the depreciation in the Colombian currency, as a result of which he had to pay the person to whom he sold the bill of exchange $376,344 of the money of that state, while on the sale of the bill he had received only $234,169.60 of the same kind of money. This belief is a pure delusion. Not merely in law but in fact this depreciation was no more an element or factor in the plaintiff's damage than any fluctuation in the price of cotton or sugar that may have occurred in the period elapsing between the sale of the bill by the plaintiff and his taking it up after it was protested as unpaid. A moment's reflection will show this to be the case. When the plaintiff was compelled to take up the bill he either had the money, realized no matter how, or was obliged to borrow it. If when the defendant subsequently paid the draft there had been no change in the value of Colombian money it is plain that he lost nothing (other than interest and exchange), for he could sell the American money and realize on the sale the exact

sum he had been compelled to pay in Colombian money. On the other hand, if Colombian money had still further depreciated, it would inure to the plaintiff's advantage, for on the sale of the American money he would be able to repay his debt in Colombian money and have a surplus.    But if Colombian money appreciated during this interval the plaintiff would, on the sale of the American money, be unable to realize the amount in Colombian money which he had paid on taking up the bill, and might be considered the loser in Colombian money of the amount of the difference, as occurred in many instances with us when, during the war, men entered into obligations for the payment of money with gold at a premium of over one hundred per cent, which they had to pay when the premium on gold had fallen to a small fraction of that amount.    Thus it may be seen how, to a man living and doing business in Colombia, fluctuations in the value of Colombian money during the time a party is in default in the payment of his obligation in American money may cause damage.    The price at which the holder of the obligation originally sold it has nothing whatever to do with the existence or amount of such damage. In this case there is no complaint of any loss by appreciation in Colombian money after defendant's failure to pay the draft, the only way in which damage by fluctuations in value could occur.    It is doubtful whether such a claim if made could be sustained, as there are decisions to the effect that where default is made in the payment of foreign money, recovery in our money is to be computed on the basis of the relative values of the two currencies at the time of default.    (*Bissell* v. *Heywood*, 96 U. S. 580, 587; *Comstock* v. *Smith*, 20 Mich. 338; *Sheehan* v. *Dalrymple*, 19 Mich. 239.)

GRAY, HAIGHT, WERNER, CHASE and COLLIN, JJ., concur with WILLARD BARTLETT, J., and CULLEN, Ch. J.

Order affirmed.